C.A. #01-1944 PAM/SRN

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 03-2571

---

| | | |
|---|---|---|
| Donna Henderson, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota |
| Ford Motor Company, | * | |
| | * | |
| Defendant/Appellee, | * | |

---

Submitted: May 14, 2004
Filed: April 14, 2005

---

Before LOKEN, Chief Judge, SMITH, Circuit Judge, and DORR,[1] District Judge.

---

DORR, District Judge.

Plaintiff-Appellant Donna Henderson ("Henderson") appeals the decision of the district court[2] granting summary judgment in favor of Defendant Ford Motor Company ("Ford") on Henderson's claims of disability discrimination and retaliation in violation of the Americans with Disabilities Act, Title VII of the Civil Rights Act

---

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri, sitting by designation.

[2]The Honorable Paul Magnuson, United States District Judge for the District of Minnesota.

SCANNED JUN 20 2005 U.S. DISTRICT COURT

of 1964, and the Minnesota Human Rights Act. For the reasons below, we affirm the decision of the district court.

**I. Factual Background**

Donna Henderson,[3] an African-American female, was employed at the Twin Cities Assembly Plant of Ford Motor Company. In 1991, Henderson prevailed on claims of sexual harassment and discriminatory and retaliatory discharge under Title VII and the Minnesota Human Rights Act, after a bench trial before then-District Judge Diana Murphy. *Evans v. Ford Motor Co.*, 768 F. Supp. 1318 (D. Minn. 1991). Judge Murphy entered an award of compensatory and punitive damages, interest, and reinstatement with seniority, and enjoined Ford and its employees from retaliating against Plaintiff for prosecuting the action. *Id.* at 1327-28.

Between 1992 and 1997, Henderson continued to file grievances and assist others with their Title VII and similar cases. During that same time, Henderson suffered a number of physical and mental ailments that precluded her from performing a full range of work. Throughout that period she was placed on"no work available," or NWA, medical leave. In March 1997, Henderson returned to work, subject to various medical restrictions. On March 20 1998, Henderson was involved in a car accident, causing Henderson to suffer from ailments including cervical-thoracic lumbrosacral spasms, myofascitis, depression, post-traumatic stress disorder a closed-head brain injury, and multiple shoulder injuries, which increased her work limitations even further. According to medical restrictions given by Henderson's doctor on November 30, 1998, she was severely restricted in the amount and nature of any lifting; could not climb, crawl, crouch, jump, kneel, push, pull, run, stoop,

---

[3]Since the beginning of her employment with Ford, Ms. Henderson has changed her name from Donna Evans. For clarity's sake, this opinion will refer to her with her current surname.

twist, or repeatedly reach or bend at her waist; required a sit-stand option; and was prohibited from operating air guns. As a result of these restrictions, Henderson remained on NWA medical leave and received disability benefits through September 1, 1999.

According to Ford's agreement with the United Auto Workers, an employee on NWA medical leave who becomes aware of a job assignment the employee can perform is required to bring this information to the attention of Ford and the Union. Ford argues that Henderson has never identified such a position, and Henderson stated that the last discussion she had with Ford employees concerning the availability of jobs was late June or early July 1999.

On July 20, 1999, Henderson, while on NWA medical leave from Ford, moved from Minnesota to Phoenix, Arizona, where she attended the High-Tech Institute of Phoenix as a full-time student.

On September 1, 1999, Ford considered Henderson's medical leave to have expired because she had failed to update her medical restrictions. Pursuant to the collective bargaining agreement, Ford sent Henderson a "5-day quit letter" on September 10, 1999. Said letter stated that within five working days, Henderson must either report to the Hourly Personnel Office for work, or give a satisfactory reason for her absence to the Hourly Personnel Office in writing or by telephone, or her employment would be terminated and her seniority would be lost. In response to the letter, Henderson called in and stated that she had sent new papers to extend her restrictions. Ford granted Henderson "conditional leave" from September 1 to September 15, to cover the previously expired time and to allow Ford time to review the medical papers sent by Henderson. Upon review Ford found that the papers were essentially a request for an extension of the November 1998 restrictions with no modifications.

retaliatory discharge in violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, and under the MHRA.[5]

*A.*

Regarding the ADA claim, Henderson first argues that Ford failed to reasonably accommodate her during her tenure with Ford. Particularly, Henderson argues that she was placed on NWA medical leave when there were jobs available for her that she could have reasonably performed with her disabilities, but that Ford refused to offer her those positions. Ford claims that such claims are barred by the statute of limitations, and that even if they are not, that Henderson fails to establish a *prima facie* case regarding her claim that Ford failed to reasonably accommodate. The district court found that the claim was barred by the state and federal statutes of limitations, and we agree with the district court.

Under the ADA, an employee must file a charge of discrimination—including failure to accommodate—within 300 days of the alleged discrimination. 42 U.S.C. § 12117 (applying the 300-day statute of limitations listed in 42 U.S.C. 2000e-5(e) to ADA claims). The MHRA requires that an employee file an administrative charge or bring a civil action within one year of the discriminatory practice. Minn. Stat. § 363.06, subd. 1, 3 (2002), *recodified at* Minn. Stat. § 363A.28 subd. 1, 3 (Supp. 2003). These causes of action accrue the date on which the adverse employment action is communicated to the employee. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258

---

[5] Except as otherwise noted, the MHRA parallels the federal statutes, and the state and federal claims will be analyzed together. *See Longen v. Waterous Co.*, 347 F.3d 685, 688 n.2 (8th Cir. 2003) (noting parallel between MHRA and the ADA); *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003) (noting parallel between MHRA and Title VII).

(1980); *Turner v. IDS Fin. Servs.*, 471 N.W.2d 105, 108 (Minn. 1991). The limitations periods begin to run even if the employee is not aware of the discriminatory effect or the employer's discriminatory motivation in taking the adverse employment action. *Dring v. McDonnell-Douglas Corp.*, 58 F.3d 1323, 1328 (8th Cir. 1995) (citing *Hamilton v. 1st Source Bank*, 923 F.2d 96, 88-89 (4th Cir. 1990)).

Henderson filed her charge on July 18, 2000; yet, in her deposition, she admitted that the last time Ford refused to offer her a job she requested was late June or early July 1999. She also admitted in her deposition that she left the Twin Cities for Arizona on July 20, 1999. Thus, her ADA claims based on Ford's alleged failure to reasonably accommodate her with job offers accrued no later than late June or early July 1999. Unless these limitations periods were tolled, these claims are time-barred.

Henderson argues that the statutes of limitations were tolled because Ford fraudulently concealed its discriminatory acts against her when she was seeking placement prior to 1999. In particular, Henderson points to an affidavit and deposition given by a Ford plant physician, Dr. Zubeidah Kahn, in 2001 in another employment discrimination case. In the documents, Dr. Kahn states that Ford labor relations managers would request that certain employees, including Henderson, not be cleared for work and that Henderson would be put on NWA medical leave immediately after complaining to management about workplace harassment. Any events referred to by Dr. Kahn would have occurred before February 1997, when Dr. Khan left Ford.

Tolling of the statutes of limitations as claimed by Henderson would be based on the doctrines of equitable estoppel or equitable tolling. The doctrine of equitable estoppel applies when the employee knows she has a claim, but the employer affirmatively and actively takes action that causes the employee not to timely file her

suit. *See Dring*, 58 F.3d at 1329; *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). This doctrine does not apply in this case because Henderson presented no evidence that she was induced not to timely file her ADA claims due to any affirmative actions by Ford.

An applicable statute of limitations may also be tolled by the doctrine of equitable tolling. This doctrine focuses on the employee's ignorance of a claim, not on any possible misconduct by the employer, and tolls the limitations period when the plaintiff, "'despite all due diligence, is unable to obtain vital information bearing on the existence of his claim.'" *Dring*, 58 F.3d at 1328 (quoting *Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994)). Stated differently, the question is, "'whether a reasonable person in the plaintiff's position would have been aware'" that her rights had been violated. *Dring*, 58 F.3d at 1329 (quoting *Chakonas*, 42 F.3d at 1135).

Henderson argues that Ford's "refusal to accommodate her disabilities only came to light after Ms. Henderson uncovered Dr. Kahn's affidavit and deposition in May 2001." However, Henderson admitted that she grew suspicious of Ford's motives as early as November 1998, when her supervisor "told me that he really needed me but he had been told not to place me on any position within the department" because she had been helping other employees file discrimination claims against Ford, and her husband had a claim pending in federal court. At this time Henderson may not have had knowledge of all the facts related to the purported discrimination, but she had knowledge of facts that were sufficient to apprise her of the purported discrimination. Certainty is not the standard. "[I]f a plaintiff were entitled to have all the time [she] needed to be *certain* [her] rights had been violated, the statute of limitations would never run—for even after judgment, there is no certainty."*Cada*, 920 F.2d at 451, *quoted in Dring*, 58 F.3d at 1329. Thus Dr. Khan's statements, even if newly-discovered, do not serve to toll the 300-day and one-year

statutes of limitations applicable to Henderson's failure to accommodate claims. Accordingly, we affirm the district court's grant of summary judgment on the failure to accommodate claims.

*B.*

Next, Henderson argues that her termination on September 23, 1999 was wrongful because she was discharged due to her disability.[6] To prove disability discrimination, an employee must show that (1) the employee is disabled within the meaning of the ADA; (2) the employee is qualified (with or without reasonable accommodation) to perform the essential functions of a job; and (3) the employee suffered an adverse employment action because of the disability. *Longen v. Waterous Co.*, 347 F.3d 685, 688 (8th Cir. 2003) (citations and quotations omitted). Once a plaintiff has proven a *prima facie* case, the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the employee to prove that the reason was pretextual. *See Kincaid v. City of Omaha*, 378 F.3d 799, 804 (8th Cir. 2004) (applying the burden-shifting to ADA discrimination cases). To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a "phony excuse." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004); *accord Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) ("'[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by

---

[6] Ford contends that this argument has been raised for the first time on appeal and we should refuse to consider it. Appellee's Br. at 28. Henderson disagrees that the issue has not been properly raised. The facts related to Henderson's preservation of the issue are not clear. However, assuming that the issue was properly preserved, we still find that is was proper for the district court to grant summary judgment.

employers, except to the extent that those judgments involve intentional discrimination.'" (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995))).

Assuming that Henderson's impairments qualify her as disabled under the ADA (a proposition not conceded by Ford but assumed for purposes of argument in Ford's brief), it is questionable whether Henderson can prove a *prima facie* case of disability discrimination. The second element of the test requires proof that Henderson is qualified to perform the essential functions of a job. Henderson's medical restrictions would certainly have severely limited her ability to work in an auto assembly plant. Additionally, there is a lack of credible evidence that between November 1998 and September 1999, Henderson ever identified a single position, which Henderson could perform with her medical restrictions, that was vacant or held by a person with less seniority as required by Ford's rules. Finally, Henderson proffers little beyond the mere fact that she was disabled and that Ford had failed to accommodate her in the past to prove that she was terminated because of her disability. In fact, most of the facts identified by Henderson to show discriminatory animus on Ford's part are linked to either her race or the fact that she had previously engaged in protected activities. *See, e.g.* Appellant's Br. at 11-15, 30-33, 38-40, 45-46, 54-57.

Even assuming that Henderson has proven a weak *prima facie* case, Ford has offered a nondiscriminatory reason for her termination—Henderson failed to report for a medical examination after Ford directed her to do so in its letter dated September 15, 1999. Henderson attempts to argue that Ford's reason is pretextual. First, she argues that Ford violated collective bargaining practices by wrongly issuing a "5-day quit" letter, which evidences Ford's pretextual dismissal. Second, she argues that previous instances of failures to accommodate, combined with the prior statements of Ford officials, demonstrate pretext. Both of Henderson's arguments fail.

First, Henderson consistently misstates exactly why Ford terminated her. It was not for failing to call in or otherwise respond to the "5-day quit" letter sent on September 10, 1999. It was because she was directed to present herself for a physical examination by the plant physician—as Ford had a right to do for any employee on NWA medical leave—and she did not do so.

Henderson also argues that a genuine issue arises because of Ford's failure to accommodate her between 1996 and 1998. She cites to this Court's decision in *Kells v. Sinclair Buick–GMC Truck, Inc.*, 210 F.3d 827 (8th Cir. 2000) for the legal proposition that a court could consider an employer's failure to accommodate as evidence of intent and pretext when determining whether an employee was discriminatorily terminated. *Kells* does not change the outcome in Henderson's case.

In *Kells*, a used car salesman sued his former employer for ADA and ADEA discrimination once he resigned after being demoted from a finance and insurance manager to a used car salesperson. *Id.* at 829. In opposing summary judgment, Kells argued that he should be allowed to present evidence of the dealership's failure to accommodate his disabilities upon his request for accommodation, even though the requests occurred *after* he was demoted. *Id.* at 833. The district court refused to consider the evidence, holding it was not relevant because the requests were made after Kells was demoted. However, this Court held that the evidence should have been considered because "[f]ailing to provide an employee with reasonable accommodations can tend to prove that the employer also acted adversely against the employee because of the individual's disability." *Id.* at 834. Considering the employee's requests, insensitive comments made by supervisors in connection with the disability and evidence that a consultant's recommendation for demotion based on performance was created after the demotion to support a non-discriminatory reason to demote Kells, the Court held that Kells created a genuine issue of fact and summary judgment was inappropriate. *Id.*

In Henderson's case, *Kells* does not help her survive summary judgment. Unlike *Kells*, any failure to accommodate has not been unequivocally proven. Such alleged failures took place long before she was terminated. Additionally, there is no evidence that Ford's reason for the termination was pretextual.[7] Henderson has not alleged that she did not receive the letter requiring her to return for a physical exam, nor has she alleged that Ford has inconsistently enforced the policy by not requiring others on NWA medical leave whose medical restrictions have not changed to return for a physical. *Cf. EEOC v. Kohler Co.*, 335 F.3d 766, 774 (8th Cir. 2003) (noting that "lax enforcement of [an employer's] company policies and disciplinary actions" evidence discriminatory motive).

Her only possible evidence of pretext—that Ford had discriminated against her in the distant past and (might have) failed to accommodate her in the recent past—are not close in time to the alleged adverse employment action, and are not related to the legitimacy of such action. As such, they do not raise a genuine issue of fact as to whether Ford's reason for terminating her is not legitimate, or, in the words of the Seventh Circuit, "phony." Thus, the district court did not err in granting summary judgment on Henderson's ADA/MHRA disability discrimination claim.

---

[7] Henderson attempts to argue that she has documentary evidence directly contradicting Ford's explanation for her termination. She cites only to statements made by various Ford managers and others relating to her placement on NWA medical leave in 1998. While the statements may cast doubt on why Ford placed Henderson on NWA medical leave initially, these statements have nothing to do with Ford's explanation for her *termination* in September 1999—that she failed to report for a medical exam. A genuine issue of material fact might exist if Plaintiff had evidence documenting that she was terminated for a reason other than her failure to report. *Cf. Kenney v. Swift Transp. Inc.*, 347 F.3d 1041, 1046 (8th Cir. 2003) (finding genuine issue of fact where plaintiff would testify that he was instructed by the employer not to fill out an employment application completely, and the employer used the plaintiff's failure to complete the application as instructed to deny plaintiff a job). However, Plaintiff has provided no such evidence.

*C.*

Finally, Henderson alleges that she was discharged in retaliation for her protected activities of filing various complaints and grievances and helping others to file discrimination claims. To state a retaliation claim, a plaintiff must show that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the two events are causally connected. *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270 (8th Cir. 1996); *see also Smith v. Ashland, Inc.*, 250 F.3d 1167, 1173 (8th Cir. 2001) (applying the same standard to retaliation claims under the MHRA). The district court found that Henderson could not make a *prima facie* case because there was no causal connection between her protected activities and her termination. We agree.

There is no doubt that Henderson engaged in a number of statutorily protected activities during her employment with Ford. She prosecuted her own discrimination claims and grievances; she assisted with the prosecution of her ex-husband's case; and she attended trials and assisted other Ford employees with their cases. However, the last protected activity that Henderson offers proof of was assisting Janell Ross in complaining about discriminatory treatment in the spring of 1997.[8] Henderson's protected activities undertaken more than two years prior to the adverse employment action are too separated in time to raise any inference of the requisite causal relationship. *See Sowell v. Alumina Ceramics, Inc.*, 251 F3d 678, 685 (8th Cir. 2001) ("[T]he seven-month time lapse between the protected activity and the alleged retaliatory act is, without more, too long for the incidents to be temporally—and therefore causally—related."); *see also Gagnon v. Sprint Corp.*, 284 F.3d 839, 851-52

---

[8] Henderson points out that the EEOC found probable cause in Ms. Ross's case on August 3, 1998, and Ford settled with Ms. Ross on or after February 2, 1999. However, Henderson does not aver that she herself engaged in any protected activities related to the Ross case during that time.

(8th Cir. 2002) (noting that a one-month lapse between the protected activity and the retaliatory act is insufficient to support a causal link alone). Henderson offers a number of pieces of evidence relating her pre-1998 protected activities to her perpetual placement on NWA medical leave status during and prior to 1998. *See* Appellant's Br. at 54-56. However, such evidence would only be relevant if the adverse employment action Henderson is complaining of is the denial of work. As explained above, that claim is barred by the applicable statutes of limitations.

Henderson also invites this Court to consider the entirety of her history with Ford to "call into serious question any claim by Ford that it fired her fair and square." Appellant's Br. at 57. Even though a court may use background information as evidence of discrimination to support a timely claim, *see Nat'l R.R. Passenger Corp. Morgan*, 536 U.S. 110, 113 (2001), Henderson's burden to show a causal connection between a protected activity and the adverse action at issue does not disappear merely because the history between employer and employee is long and contentious. Because Henderson has offered no credible proof of a connection between past activities and her ultimate termination, she cannot make out a *prima facie* case of Title VII retaliation. Therefore, summary judgment is proper on this issue.

## IV. Conclusion

The long and short of this case is that Henderson was terminated, after a long period of NWA medical leave, for failing to return to the place of employment for a medical evaluation by a Ford physician. Henderson has no evidence that Ford's current reason for dismissing her was pretextual or that her previous protected activities were causally connected to her dismissal. Her alleged discrimination claims relating to being placed or retained on NWA medical leave are barred by the applicable state and federal statutes of limitations, and Dr. Khan's statements made

in another case do not require that such limitations period be tolled. We therefore affirm the well-reasoned opinion of the district court.

---



A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans